TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, NY 10119
Telephone: (212) 594-5000
Kyle J. Ortiz
Brian F. Moore
Katharine E. Scott

*Proposed Counsel for the Debtor
and Debtor in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ZUCA PROPERTIES LLC, | Case No.: 21-11082 (XXX) |
| Debtor.[1] | |

### DISCLOSURE STATEMENT FOR THE
### PREPACKAGED PLAN OF LIQUIDATION OF ZUCA PROPERTIES LLC

**THIS DISCLOSURE STATEMENT IS SENT TO YOU AS PART OF THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PREPACKAGED PLAN OF LIQUIDATION OF ZUCA PROPERTIES LLC (AS MAY BE AMENDED, SUPPLEMENTED, OR OTHERWISE MODIFIED FROM TIME TO TIME, THE "PLAN"). IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND WITHIN THE MEANING OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE, IF YOU ARE A HOLDER OF A CLAIM IN CLASS 7 YOU ARE ENTITLED TO VOTE ON THE PLAN. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTOR INTENDS TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTOR'S FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1] The last four digits of the Debtor's federal tax identification number are 5359. The Debtor's address is c/o Togut, Segal & Segal LLP, One Penn Plaza, Suite 3335, New York, New York, 10119.

# I.    INTRODUCTION

Zuca Properties LLC (the "***Debtor***") plans to file a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") and, concurrently therewith or soon thereafter, to file the Plan.  This Disclosure Statement is being sent to all holders of Claims[2] in Class 7 in connection with the solicitation of votes to accept or reject the Plan in advance of the date of commencement of the contemplated chapter 11 case of the Debtor (the "***Petition Date***") and prior to the hearing to consider confirmation of the Plan (the "***Confirmation Hearing***"), which shall be scheduled at a later date to be determined by the Bankruptcy Court.  The Plan is attached to this Disclosure Statement as ***Exhibit "A."***

If you are or may be entitled to vote on the Plan, the Ballot for acceptance or rejection of the Plan is enclosed with this Disclosure Statement.  The Voting Record Date for determining which holders of Claims and Equity Interests are entitled to vote on the Plan is June 2, 2021.  If you did not receive a Ballot, it is because the Debtor, as the proponent of the Plan, believes that you have not asserted a Claim in Class 7, the only class in the Plan that is entitled to vote.

The Debtor submits that this Disclosure Statement contains information of a kind and in sufficient detail adequate to enable hypothetical, reasonable investors to make an informed judgment as to whether to accept or reject the Plan such that, after notice and a hearing, the Bankruptcy Court would enter an order approving this Disclosure Statement if it were called upon to do so.  **AS NOTED ABOVE, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE DEBTOR INTENDS TO SUBMIT THIS DISCLOSURE STATEMENT TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTOR'S FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE.  APPROVAL OF THE DISCLOSURE STATEMENT, HOWEVER, DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

Please read this Disclosure Statement in its entirety before voting on the Plan.

To be counted, your Ballot must be actually received by 5:00 p.m. prevailing Eastern Time on July 8, 2021 (the "***Voting Deadline***").  Ballots may be delivered either (i) electronically to the following email address: Zucaballots@teamtogut.com or (ii) by delivering a paper copy to the Debtor's counsel at the following address:

Togut, Segal & Segal LLP
One Penn Plaza, Suite 3335
New York, New York 10119
Attn: Kyle J. Ortiz, Brian F. Moore, Katharine E. Scott

---

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to such term in the Plan.

**BALLOTS MUST BE DELIVERED BY MAIL, COURIER, OR DELIVERY SERVICE OR ELECTRONICALLY BY EMAIL. FACSIMILE BALLOTS WILL <u>NOT</u> BE ACCEPTED. ANY COMPLETED BALLOTS RECEIVED THAT DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR THAT INDICATE BOTH AN ACCEPTANCE AND REJECTION OF THE PLAN WILL NOT BE COUNTED.**

## II.     BACKGROUND

### A.     The Debtor and its Property

The Debtor is a member-managed limited liability company organized under the laws of the State of Delaware, having its corporate headquarters at c/o JTC (Suisse) S.A., 80-84 Rue du Rhone, 1204 Geneva, Switzerland. The Debtor was established by Rahula Withanage on May 22, 2009 as a limited liability company under Delaware law, and on September 29, 2009, Rahula transferred all of his membership interest in the Debtor to The Woofy Trust (the "***Trust***"). The Trust was established on September 17, 2009 under English law, and Rahula Withanage is the Settlor of the Trust. The Trust is currently the sole member of the Debtor with 100% ownership interest in the Debtor. The Trustee of the Trust is JTC (Suisse) S.A. ("***JTC***"). The beneficiaries of the Trust are Rayo Withanage ("***Withanage***"), Withanage's estranged wife Mayra Tozzi Gottsfritz ("***Gottsfritz***"), and Withanage's children and remoter issue.

### 1.     The Debtor's Business and History

The Debtor was established to acquire property investments to serve as funding for the Trust. On May 26, 2009, the Debtor purchased a penthouse condominium unit at 470 Broome Street in the New York city neighborhood of SoHo (the "***PHS Unit***") for $4.3 million, which was intended to serve as a residence for the Trust beneficiaries. On April 30, 2010, the Debtor purchased a second penthouse condominium unit in the same building for $3.8 million (the "***PHN Unit***" and together with the PHS Unit, the "***Condo Units***") as investment property for the Trust.

### 2.     Management of the Condo Units

On August 1, 2010, the Debtor appointed Grant, Herrmann, Schwartz & Klinger LLP ("***GHS&K***") as property manager of the Condo Units. The Debtor understands that invoices for GHS&K, which were sent to Withanage, went unpaid and that GHS&K resigned. Following GHS&K's resignation, Gottsfritz informally assumed the role of property manager of the Condo Units.

During the time she held herself out as property manager of the Condo Units, Gottsfritz retained Brown Harris Stevens Residential Sales, LLC ("***Brown Harris***") to act as her broker with the exclusive right to lease (including sublease) the Condo Units for the period between April 16, 2012 and October 15, 2012. Gottsfritz resigned as property manager on May 14, 2013 and on that same day, Withanage agreed to formally assume the role of property manager of the Condo Units. His duties – including monitoring the collection of rent and payment of the mortgage and

reporting such rental and mortgage payments to the Debtor, among others – were set forth in a letter signed by Withanage and the Debtor.

Withanage subsequently resigned on February 5, 2019 and requested that an individual named Dan Fenster ("***Fenster***") be appointed as his successor. The Trust made repeated attempts to formally appoint Fenster as property manager. Fenster declined any formal appointment, but nonetheless provided the Trust with periodic updates on the status of the rental and sale of the Condo Units through May 14, 2020. However, neither Withanage nor Fenster has been responsive to the Debtor's requests for information or access to the Condo Units since May 2020.[3]

Currently there is no formal manager of the Condo Units, and the Debtor, through the Trust, has attempted to administer the day-to-day affairs of the Condo Units; but as discussed in detail below, the Debtor's efforts have been frustrated by the conduct of and lack of cooperation from Withanage.

3.     Authorized and Unauthorized Occupancy of the Condo Units

From October 2009 to November 2018, Gottsfritz and Withanage resided in the PHS Unit.

From June 2012 to February 2017, the PHN Unit was rented from time to time at the market rate.

The Debtor understands that Withanage and Gottsfritz separated at some point during 2018 and that upon commencing divorce proceedings, Withanage began to occupy the PHN Unit without the Debtor's knowledge or consent. At no time did the Debtor enter into a lease agreement with Withanage or collect rent from him for his occupancy of the PHN Unit.

During an in-person meeting on January 16, 2019, Rahula Withanage informed the Trust that while Withanage and Gottsfritz were in the process of divorcing, Gottsfritz was living in the PHS Unit but would move out shortly, and Withanage was living in the PHN Unit but had since moved out. At that same meeting, Rahula Withanage requested that the Trust consider selling or renting the Condo Units.

4.     Interference with Marketing the Condo Units for Lease and Sale

On behalf of the Debtor, on March 1, 2019, the Trust appointed Brown Harris as agent to lease the Condo Units, and on March 12, 2019, the Trust appointed Compass, Inc. ("***Compass***") as agent to sell the Condo Units.

The Trust was unsuccessful in its attempts to rent the PHN Unit, and after a lease arrangement fell through in May 2019, the Trust set its sights on selling the PHN Unit. The PHN Unit was listed on July 17, 2019 for $6.295 million.

Gottsfritz was still occupying the PHS Unit at that time and was not willing to cooperate with the Debtor's marketing and sale efforts. Thus, the PHS Unit

---

[3]     The Debtor understands that Fenster may still be in possession of certain records of the Debtor.

was not placed on the market.  Because the Trust was unable to market the Condo Units together as a package, the PHN Unit was subsequently taken off the market on July 31, 2019.  However, by January 2, 2020, recognizing the need to move forward with sale of the PHN Unit at minimum and believing that the PHN Unit was vacant, the Trust relisted the PHN Unit for $5.995 million.

Without seeking the Debtor's authorization, on January 22, 2020, Withanage advised the Trust that he was attempting to find a short-term renter for the PHN Unit.  In response, on January 31, 2020, the Trust sent a letter to Compass to remind Compass that Withanage does not own either of the Condo Units, nor was he currently appointed as property manager.  Notwithstanding his lack of authority to rent the Condo Units, Withanage arranged a month-to-month lease agreement for the rental of the PHN Unit at half the market rate to his friend Elia Zois starting on February 1, 2020.  Zois vacated the apartment on or about June 1, 2020 with approximately $40,000 in rent arrears[4] and the Trust changed the locks on the unit.

Subsequently on or about December 6, 2020, Withanage regained access to the PHN Unit, changed the locks, and took up unauthorized residency again.  The Trust became aware of Withanage's unauthorized tenancy by email from Withanage on December 8, 2020 whereby Withanage claimed to maintain furniture at the property and pay the utilities.

In early April 2021, the Trust engaged in discussions with Gottsfritz's United States counsel and agreed to a firm timetable for Gottsfritz to vacate the PHS Unit.  When Gottsfritz ultimately vacated the PHS Unit, the Debtor understands that Withanage changed the locks to the PHS Unit and began an unauthorized occupancy of the PHS Unit in addition to the PHN Unit.

5.    The Condo Units Currently

The Debtor does not currently hold leases with any tenant for either Condo Unit and no persons have any right or are authorized to occupy either of the Condo Units.  Withanage, however, maintains his transient occupancy in both the Condo Units as of the filing of this Declaration, frustrating the Debtor's efforts to lease or market and sell the Condo Units.[5]

---

[4]    The Debtor understands that Zois filed an individual petition for relief under chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New Jersey on February 6, 2019, and on May 21, 2021, the Department of Labor filed a criminal complaint in the United States District Court for the District of New Jersey against Zois for the alleged filing of a fraudulent bankruptcy petition.  As such, the Debtor does not anticipate collecting rent arrears from Zois.

[5]    The Debtor was recently informed by Tyrus Capital, an affiliate of TECREF, that Withanage may have temporarily left the Condo Units to travel to France.  The Debtor is seeking to regain access prior to Withanage's return.  If unsuccessful, as described below, the Debtor plans to send a Notice to Quit and if that is not honored, to commence an action to hold Withanage in violation of the automatic stay and to obtain control over the Condo Units.

### B. The Debtor's Capital Structure

#### 1. The Debtor's Assets

The Debtor has no significant assets other than the Condo Units and no sources of income while the Condo Units are unable to be leased due to Withanage's occupancy.

The Debtor currently maintains four bank accounts: (i) a deposit account No. 0011 with the Bank of N. T. Butterfield & Son Limited, (ii) a blocked security account No. 4945 with JPMorgan Chase Bank, N.A. ("**JPMorgan**") which has approximately $125,000 and is subject to the security interest of JPMorgan, and (iii) two mortgage accounts (Nos. 8675 and 8686) with JPMorgan associated with the PHN Note and PHS Note (each as defined below).

#### 2. The Debtor's Liabilities

JPMorgan Chase Bank, N.A. ("**JPMorgan**") is a secured creditor of the Debtor and has a first lien on and security interest in the Condo Units as set forth below.

#### a) The PHN Note

On or about July 8, 2010, the Debtor executed and delivered to JPMorgan a promissory note in the original principal amount of $1.825 million (as amended, modified, or supplemented from time to time, the "**PHN Note**").

On or about July 8, 2010, to secure the PHN Note, the Debtor executed and delivered to JPMorgan a Mortgage (the "**PHN Mortgage**"), which granted to JPMorgan a lien on and security interest in the PHN Unit. On or about July 21, 2010, the PHN Mortgage was recorded in the Office of the City Register of the City of New York bearing City Register File No. 2010000243363.

JPMorgan holds a secured claim against the Debtor on account of the PHN Note and the PHN Mortgage in an amount equal to $1,810,221.03 as of May 14, 2021, plus interest accruing thereafter to the Initial Distribution Date at the per diem rate of $115.04, plus fees and expenses reimbursable under the PHN Mortgage from and after the Petition Date (the "**JPMorgan PHN Unit Secured Claim**").

The JPMorgan PHN Unit Secured Claim is deemed an Allowed Claim under the Plan.

#### b) The PHS Note

On or about July 8, 2010, the Debtor executed and delivered to JPMorgan a promissory note in the original principal amount of $1.975 million (as amended, modified, or supplemented from time to time, the "**PHS Note**").

On or about July 8, 2010, to secure the PHS Note, the Debtor executed and delivered to JPMorgan a Mortgage (the "**PHS Mortgage**"), which granted to JPMorgan

a lien on and security interest in the PHS Unit. On or about November 1, 2010, the PHS Mortgage was originally recorded in the Office of the City Register of the City of New York bearing City Register File No. 2010000363719. On or about February 17, 2011, a corrected copy of the PHS Mortgage was recorded in the Office of the City Register of City of New York bearing City Register File No. 2011000059158.

JPMorgan holds a secured claim against the Debtor on account of the PHS Note and the PHS Mortgage in an amount equal to $1,684,716.72 as of May 14, 2021, plus interest accruing thereafter to the Initial Distribution Date at the per diem rate of $106.31, plus fees and expenses reimbursable under the PHS Mortgage from and after the Petition Date (the "***JPMorgan PHS Unit Secured Claim***").

The JPMorgan PHS Unit Secured Claim is deemed an Allowed Claim under the Plan.

### c) The TECREF Guaranty

On or about January 4, 2018, Withanage, as borrower, entered into a Facility Agreement (the "***TECREF Facility Agreement***") by and between Withanage, the Debtor, as guarantor, Gottsfritz, as support provider, and TECREF S.à r.l. ("***TECREF***"), as lender. Pursuant to the TECREF Facility Agreement, TECREF agreed to make a loan in the principal amount of €25 million (the "***TECREF Loan***") to Withanage in connection with Withanage's purchase of L'Antre du Minotaure (the Den of the Minotaur), a French estate located in Mougins, France, and the last known residence of famed artist, Pablo Picasso (the "***Picasso Estate***"). This high-profile estate is widely regarded as one of the finest properties in the south of France. As a condition precedent to, and material inducement of, making the TECREF Loan, the Debtor entered into that certain Guaranty Agreement dated as of January 4, 2018 (the "***TECREF Guaranty***") in favor of TECREF pursuant to which the Debtor absolutely and unconditionally guaranteed full and punctual payment and performance when due of all of Withanage's obligations under the TECREF Facility Agreement.

On or about January 4, 2018, to secure the TECREF Guaranty, the Debtor executed and delivered to TECREF a Mortgage, Assignment of Leases and Rents, and Security Agreement (the "***TECREF Mortgage***") which granted to TECREF a lien on and security interest in substantially all of the Debtor's assets, including the Condo Units, up to a maximum principal indebtedness of $5 million plus certain additional amounts. Such mortgage was recorded in the Office of the City Register of the City of New York on or about January 18, 2018 bearing City Register File No. 2018000021476. In addition, on or about January 4, 2018, the Debtor executed and delivered to TECREF an Assignment of Leases and Rents (the "***TECREF Assignment of Rents***").

Furthermore, the Trust entered into that certain Membership Interest Pledge and Security Agreement (the "***TECREF Pledge and Security Agreement***") dated January 4, 2018, with TECREF, which pledged 100% of the membership interests in the Debtor to TECREF as additional security for the TECREF Loan. The TECREF Facility Agreement, the TECREF Assignment of Rents, the TECREF Guaranty, the TECREF Mortgage, the TECREF Pledge and Security Agreement, and all other documents and instruments that evidence, secure, or otherwise relate to any of the aforementioned

agreements, together with all amendments, modifications, substitutions, or replacements thereof are referred to herein as the "***TECREF Loan Documents***."

TECREF holds a secured claim against the Debtor on account of the TECREF Guaranty in an amount equal to $5,646,492.52 as of June 2, 2021, plus interest accruing thereafter to the Initial Distribution Date at the *per diem* rate of $3,125, plus fees and expenses reimbursable under the TECREF Mortgage from and after the Petition Date (the "***TECREF Secured Claim***").

The TECREF Secured Claim is deemed an Allowed Claim under the Plan.

### d)      The Debtor's Other Secured Obligations

The Debtor is aware of a judgment lien against the PHN Unit arising from a default judgment entered against it on July 24, 2020, in favor of a certain Mr. David Rubin. Such judgment remains unsatisfied in the amount of approximately $21,398.87 as of March 12, 2021.  The Debtor does not concede that this is an Allowed Claim and reserves all rights to object to this claim or to assert any rights, claims, setoffs, or defenses it may have relating to such claim, including, without limitation, relating to the failure of Mr. Rubin to pay rent owed to the Debtor during the period he leased the PHN Unit from the Debtor or relating to any effort or action by Mr. Rubin that may have assisted, aided, or abetted Mr. Withanage in his use or occupancy of the PHN Unit.

### e)      The Debtor's Unsecured Obligations

The Debtor estimates that it has approximately $55 million in unsecured liabilities.

Most of the unsecured liabilities stem from the TECREF Unsecured Claim, defined in the Plan to be the balance remaining of the Claim of TECREF arising under the TECREF Guaranty after deducting any amounts received by TECREF on account of the TECREF Secured Claim, which is an Allowed Unsecured Claim in an amount equal to $53,230,705.23 as of June 2, 2021, plus interest accruing thereafter to the Petition Date at the per diem rate of $31,592.58.

In addition, Tyrus Capital, an affiliate of TECREF, holds an unsecured claim against the Debtor for reimbursement of amounts advanced on behalf of the Debtor, as evidenced by that certain demand note dated, May 26, 2021, in an amount equal to $75,000.  The Claim of Tyrus Capital is deemed an Allowed Claim under the Plan.

48.      Certain prepetition legal service fees totaling less than $12,000 owed to Charles Russell Speechlys S.A. and less than $45,000 owed to McDermott Will & Emery LLP, and certain prepetition management and administration fees owed to JTC totaling 275,355.95 CHF ($306,877.87 on the Petition Date) remain outstanding as of the Petition Date.  JTC Law also holds an unsecured claim for £24,050 ($34,098.57 on the Petition Date) for legal services provided on behalf of the Debtor.

In addition, the Debtor is aware of at least one potential claim alleged by Rahula Withanage based on alleged advances in the amount of $2,083,033.19 plus interest at a rate of 5% per annum. The Debtor disputes this claim and believes it is without merit.

Other liabilities may exist including liabilities for any unpaid amounts relating to that portion of the condominium's common charges attributable to the Condo Units; however, if such liabilities exist, the Debtor believes that any such liabilities are de minimis. Further, as explained below, Withanage holds certain records due to his former fiduciary role as property manager of the Condo Units, which records he has continued to improperly withhold from the Debtor and the Trust despite resigning as property manager.

### III. EVENTS LEADING TO THIS CHAPTER 11 CASE AND PURPOSE FOR THE CHAPTER 11 CASE

#### A. The Defaults

Withanage entered into the TECREF Facility Agreement with TECREF to obtain financing needed by Withanage in connection with his acquisition of the Picasso Estate. The TECREF Facility Agreement was intended as a bridge loan that would allow Withanage time to find a long-term lender to refinance the property on more sustainable terms. In connection therewith, by the TECREF Guaranty, the Debtor guaranteed payment of amounts owed to TECREF under the TECREF Facility Agreement, which was secured in part by the Condo Units.

52. Withanage has been unsuccessful in attracting an alternative lender to refinance the TECREF Facility Agreement. On or about January 4, 2019, Withanage defaulted on his payment obligations under the TECREF Facility Agreement, which default was in addition to several earlier defaults relating to Withanage's failure to comply with certain conditions subsequent in the TECREF Facility Agreement, and Withanage has failed to make certain payments and remains in default under the TECREF Facility Agreement. As a result, the Debtor is in default under the TECREF Loan Documents.

On or about June 18, 2019, the Debtor defaulted on the PHN Note and the PHS Note. The Debtor became aware of the default by notice dated September 17, 2019 whereby TECREF demanded repayment of amounts owed on account of the TECREF Guaranty. As guarantor under the TECREF Guaranty, the Debtor is responsible to TECREF for such amounts under the TECREF Facility Agreement but does not have sufficient cash on hand to satisfy its obligations thereunder and is presently in default under the TECREF Guaranty.

#### B. The Debtor's Efforts to Market the Condo Units

The Debtor, having no assets other than the Condo Units, and having no other reasonable alternative to raise the capital that would be required to satisfy its debts to JPMorgan, TECREF, and its other creditors (including, without limitation, the

disputed claim of Rahula Withanage to the extent that such claim is determined to be valid), has determined that the only viable option is to sell the Condo Units.

Recognizing the fact that low market demand was unlikely to support a simultaneous sale of both Condo Units in early 2020, the Debtor, on the advice of its broker and counsel at the time, decided to market the Condo Units separately. As detailed above, the Debtor decided to market only the PHN Unit initially because, at the time, the Debtor believed the PHN Unit to be vacant and therefore easier to market and sell, whereas the PHS Unit was occupied by Ms. Gottsfritz who has since vacated the premises.

At first it seemed as if the Debtor's efforts would be successful. In January 2021, the Debtor held serious talks with a prospective buyer who was willing to offer $5.2 million for the PHN Unit. The prospective buyer, however, conditioned his offer on the ability to physically tour the property before concluding any sale.

Notwithstanding Rahula Withanage's express confirmation that Withanage vacated the PHN Unit in November 2018 and the fact that the Trust changed the locks for most of 2020, the Debtor discovered that in December 2020 without permission or license from the Debtor, Withanage changed the locks on the PHN Unit and again installed himself as an unauthorized occupant. The Debtor's efforts to sell the PHN Unit have since been severely impacted, and indeed made all but impossible, by Withanage's unwillingness to vacate the PHN Unit and his refusal to allow access to either the Debtor's broker or any prospective purchaser. Indeed, another prospective buyer with an offer of $5.2 million for the PHN Unit conditioned his offer on being able to view the premises.

On or about April 2021, the Debtor learned that Withanage, with full knowledge of the Debtor's opposition to his continued unauthorized occupancy of the PHN Unit, also commenced occupation of the PHS Unit following Gottsfritz's departure from the premises and changed the locks again, further inhibiting the Debtor's ability to sell the Condo Units. Recognizing that Withanage appears unlikely to voluntarily leave the Condo Units in a timely manner and facing enforcement actions by JPMorgan and/or TECREF, the Debtor has determined that the situation with Withanage cannot be resolved without more formal action. As one last effort to permit Withanage to vacate the Condo Units consensually, contemporaneously with the commencement of this Chapter 11 Case, the Debtor plans to serve a Notice to Quit on Withanage – or if he is still in France at the time of the filing, to repossess the Condo Units. If Withanage does not comply within the ten days required under the Notice to Quit, the Debtor intends to take action to hold Withanage in violation of the automatic stay and to obtain control over the Condo Units.

The Debtor is in the process of retaining a broker to assist the Debtor with the marketing and sale of the Condo Units. Essential to the Debtor's efforts to market the properties is that prospective purchasers be able to visit and tour the Condo Units.[6] Thus, it is critical to the success of the Debtor's Chapter 11 Case that Withanage quit his

---

[6]    Indeed, without access to the Condo Units, even a virtual tour is impossible.

unauthorized occupancy either voluntarily or pursuant to an order of the Bankruptcy Court.

## C. The Debtor's Purpose for this Chapter 11 Case

Given the above, the fact that the Condo Units are presently encumbered by multiple mortgages and the Debtor is in default of its obligations to JPMorgan and TECREF, and to take advantage of a significantly improving New York City real estate market given the emergence from the COVID-19 pandemic – an improving market which is uncertain to last – the Debtor has determined that now is the time to market and sell the Condo Units pursuant to a value maximizing process.

Recognizing that the support of its creditors is crucial to a successful outcome, the Debtor and its sole member, the Trust, acting through JTC as Trustee, engaged in discussions with TECREF as the second lienholder on the Condo Units to chart a path forward.[7]  Ultimately, the Debtor, in consultation with TECREF, determined that the best way to successfully accomplish a sale and to preserve and maximize value of the Debtor's assets was through a filing under chapter 11 of the Bankruptcy Code and by seeking approval of a sale of the Condo Units pursuant to a prepackaged chapter 11 plan that the Debtor would solicit immediately prior to the Petition Date.

The Chapter 11 Case offers the Debtor a single forum to accomplish a myriad of undertakings, including running a sale process and selling its assets free and clear of liens, claims, and interests under the Plan, addressing the claims of its creditors, including those claims of JPMorgan and TECREF, resolving any disputed claims such as the recent unsubstantiated demand by Rahula Withanage for over $2 million, and effectuating the removal of Withanage from the Condo Units, which is essential for *any* sale to occur.  The Debtor has determined that attempting to accomplish the aforementioned undertakings outside of bankruptcy would likely require the Debtor to take actions in multiple forums without the benefit of the automatic stay, which would be cost prohibitive, take significantly longer than it would in chapter 11 pursuant to a plan of liquidation, generate significant risk to the value of the Debtor's assets, and create uncertainty for the Debtor's creditors.

## IV. THE PLAN OF LIQUIDATION

The following is a brief overview of certain provisions of the Plan.  This overview is qualified in its entirety by reference to the Plan, a copy of which is included as **Exhibit "A."**  In the event of any inconsistency between the Plan and this Disclosure Statement, the Plan shall govern in all respects.

## A. Treatment

Except for liabilities that are expressly assumed by the Purchaser, the cash proceeds, net of any cash proceeds payable to holders of Allowed Secured Claims with respect to the Condo Units, will be distributed to holders of Claims and Equity Interests

---

[7]  Based on the estimated property values of the Condo Units, the Debtor anticipates that JPMorgan as first lienholder will be paid in full out of the proceeds of the sales.

in the order of priority established by the Bankruptcy Code. After payment in full of Allowed Administrative Expenses and Allowed Priority Claims, if any, Claims and Equity Interests will be classified and treated as follows:

| CLASS | TREATMENT | STATUS | VOTING RIGHTS |
|---|---|---|---|
| **Class 1:** JPMorgan PHN Unit Secured Claim | On the Effective Date or any later date to which JPMorgan agrees, paid in full, in Cash. | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| **Class 2:** JPMorgan PHS Unit Secured Claim | On the Effective Date or any later date to which JPMorgan agrees, paid in full, in Cash. | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| **Class 3:** TECREF Secured Claim | On the Effective Date, satisfied in full. | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| **Class 4**: Other Secured Claims | Paid in full, in Cash, on the later of the Effective Date and as soon as practicable after the Other Secured Claim becomes Allowed. | Unimpaired | Deemed to Accept; Not Entitled to Vote |
| **Class 5:** Priority Claims | Paid in full, in Cash, on the later of the Effective Date and as soon as practicable after such Priority Claim becomes Allowed. | Unimpaired | Deemed to Accept; Not Entitled to vote |
| **Class 6:** Convenience Claims | Paid in full, in Cash, on the later of the Effective Date and the date on which a Convenience Claim becomes Allowed. | Unimpaired | Deemed to Accept; Not Entitled to Vote |

| CLASS | TREATMENT | STATUS | VOTING RIGHTS |
|-------|-----------|--------|---------------|
| **Class 7:** Allowed Unsecured Claims Other than Convenience Claims | On each Distribution Date, paid its Pro Rata Share of Available Cash *less* the aggregate amount of Cash previously distributed to the holder of such Allowed Unsecured Claim in any Distribution made prior thereto.[8] | Impaired | Entitled to Vote |
| **Class 8:** Equity Interests | Reinstated, but will not receive any Distribution unless and until all Allowed Unsecured Claims in Class 7 are satisfied in full. | Unimpaired | Deemed to Accept; Not Entitled to Vote. |

1. **Class 1 – JPMorgan PHN Unit Secured Claim**

(i) *Classification*: Class 1 is comprised of the JPMorgan PHN Unit Secured Claim.

(ii) *Treatment*: Except to the extent that the holder of the JPMorgan PHN Unit Secured Claim agrees to a different, less favorable treatment, the holder of the JPMorgan PHN Unit Secured Claim will receive, on the Effective Date, payment in full, in Cash, of the JPMorgan PHN Unit Secured Claim.

(iii) *Status*: Class 1 is unimpaired, the holder of the Class 1 Claim is not entitled to vote on the Plan, and the holder of the Class 1 Claim is deemed to accept the Plan.

2. **Class 2 – JPMorgan PHS Unit Secured Claim**

(i) *Classification*: Class 2 is comprised of the JPMorgan PHS Unit Secured Claim.

(ii) *Treatment*: Except to the extent that the holder of the JPMorgan PHS Unit Secured Claim agrees to a different, less favorable treatment, the holder of the JPMorgan PHS Unit Secured Claim will

---

[8] TECREF intends to enter into a certain sharing arrangement with the Trust whereby TECREF will share a portion of any recovery it receives on account of its Allowed TECREF Unsecured Claim with the Trust up to a certain amount with the intention that the Trust will use such funds received from this sharing arrangement to satisfy outstanding expenses incurred by the Trust, including outstanding legal fees. The Trust and TECREF agreed to such sharing arrangement during the course of negotiations related to the Plan. This sharing arrangement is not part of the Plan and has no effect on distributions to be received under the Plan by any holders of Claims or Equity Interests.

receive, on the Effective Date, payment in full, in Cash, of the JPMorgan PHS Unit Secured Claim.

(iii)     *Status*:  Class 2 is unimpaired, the holder of the Class 2 Claim is not entitled to vote on the Plan, and the holder of the Class 2 Claim is deemed to accept the Plan.

**3.     Class 3 – TECREF Secured Claim**

(i)     *Classification*:  Class 3 is comprised of the TECREF Secured Claim.

(ii)     *Treatment*:  Except to the extent that the holder of the TECREF Secured Claim agrees to a different, less favorable treatment, the holder of the TECREF Secured Claim will receive, on the Effective Date, payment in full of the TECREF Secured Claim.  Such payment will be made either in Cash or by means of a full or partial credit against the purchase price for any of the Sale Assets if and to the extent that TECREF is a Successful Bidder or exercises its rights under the TECREF Backstop Transaction.

(iii)     *Status*:  Class 3 is unimpaired, the holder of the Class 3 Claim is not entitled to vote on the Plan, and the holder of the Class 3 Claim is deemed to accept the Plan.

**4.     Class 4 – Other Secured Claims**

(i)     *Classification*:  Class 4 is comprised of the Other Secured Claims.

(ii)     *Treatment*:  Except to the extent that a holder of an Other Secured Claim agrees to a different, less favorable treatment, the holder of an Allowed Other Secured Claim will receive payment in full, in Cash, of its Allowed Other Secured Claim on the later of (x) the Effective Date and (y) as soon as practicable after its Other Secured Claim becomes Allowed.

(iii)     *Status*:  Class 4 is unimpaired, holders of Class 4 Claims are not entitled to vote on the Plan, and holders of Class 4 Claims are deemed to accept the Plan.

**5.     Class 5 – Priority Claims**

(i)     *Classification*:  Class 5 is comprised of Allowed Priority Claims.

(ii)     *Treatment*:  Except to the extent that a holder of an Allowed Priority Claim agrees to a different, less favorable treatment, the holder of an Allowed Priority Claim in Class 5 will receive Cash in an amount equal to such holder's Allowed Priority Claim on the later of (x) the Effective

Date and (y) as soon as practicable after its Priority Claim becomes Allowed.

(iii)    *Status*: Class 5 is unimpaired, the holders of Class 5 Claims are not entitled to vote on the Plan, and holders of Class 5 Claims are deemed to accept the Plan.

**6.    Class 6 – Convenience Unsecured Claims**

(i)    *Classification*: Class 6 is comprised of Allowed Convenience Claims.

(ii)    *Treatment*: Except to the extent that a holder of an Allowed Convenience Claim in Class 6 agrees to a different, less favorable treatment, the holder of an Allowed Convenience Claim in Class 6 will receive Cash in an amount equal to such holder's Allowed Convenience Claim on the later of (x) the Effective Date and (y) as soon as practicable after its Convenience Claim becomes Allowed.

(iii)    *Status*: Class 6 is unimpaired, the holders of Class 6 Claims are not entitled to vote on the Plan, and holders of Class 6 Claims are deemed to accept the Plan.

**7.    Class 7 – Unsecured Claims That Are Not Convenience Claims**

(i)    *Classification*:  Class 7 is comprised of Allowed Unsecured Claims that are not Class 6 Claims.

(ii)    *Treatment*:  Except to the extent that a holder of an Allowed Unsecured Claim in Class 7 agrees to a different, less favorable treatment, each holder of an Allowed Unsecured Claim in Class 7 will receive, on each Distribution Date, its Pro Rata Share of Available Cash *less* the aggregate amount of Cash previously distributed to the holder of such Allowed Unsecured Claim in any Distribution made prior thereto.  If the amount of Available Cash as of any Distribution Date, other than the Final Distribution Date, is less than $50,000, then the Disbursing Agent may elect to defer the Distribution Date until the next scheduled Distribution Date.

(iii)    *Status*: Class 7 is impaired, and the holders of Class 7 Claims are entitled to vote on the Plan.

**8.    Class 8 – Equity Interests**

(i)    *Classification*:  Class 8 consists of Allowed Equity Interests.

(ii)    *Treatment*:  The holder of the Allowed Equity Interests will retain its Equity Interests, but will not receive any Distribution until and unless holders of Allowed Unsecured Claims in Class 7 are paid in full. After payment in full of all Allowed Unsecured Claims in Class 7, all

Available Cash shall be paid to the holder of the Allowed Equity Interests as and when determined by such holder and without any other restriction imposed by the Plan.

(iii)    *Status*:  Class 8 is unimpaired, and the holder of Class 8 Equity Interests is not entitled to vote on the Plan.

**B.    Sale**

The Plan contemplates the sale of the Condo Units as *"Sale Assets"* on the Effective Date, free and clear of all liens, claims, and interests, and the distribution of the net proceeds from such sale to holders of Allowed Claims in accordance with their legal interests and relative priorities.  In that connection, the Debtor will engage a broker with experience in marketing high-end residential real estate in New York City to run a sales process for each of the units.

Pursuant to Article 8.6(b) of the Plan, the satisfaction of all conditions to the occurrence of the sale of the Sale Assets is a condition to the occurrence of the Effective Date.  The Debtor may waive such condition, however, with the express written consent of TECREF (given in its sole and absolute discretion).  Unless such condition is waived, and the sale of the PHN Unit or the PHS Unit occurs after the Effective Date, all the Sale Assets will be sold on the Effective Date.

In the event a Purchaser for all or a portion of the Sale Assets has not been identified by the Debtor prior to entry of the Confirmation Order, and the Debtor having taken all reasonable steps to market such Sale Assets, then TECREF or its nominee, at its sole and absolute election, may submit a bid for the relevant Sale Assets and enter into the TECREF Backstop Transaction, the terms of which must be mutually acceptable to the Debtor and TECREF.  In connection with the TECREF Backstop Transaction, TECREF or its nominee must pay the Minimum Cash Purchase Price for the relevant Sale Assets.  Except for the Minimum Cash Purchase Price, TECREF may credit bid as part of its Purchase Price for the relevant Sale Assets up to the amount of its TECREF Secured Claim.  The cash portion of the Purchase Price shall be payable by TECREF by one or more confirmed electronic federal wire transfers of funds at the Closing, as directed by Debtor.  For the avoidance of doubt, in the event a Purchaser for all or a portion of the Sale Assets has not been identified by the Debtor prior to entry of the Confirmation Order, the Debtor may continue taking all steps to market the Sale Assets unless and until TECREF or its nominee makes an election for the TECREF Backstop Transaction.

The Confirmation Order will authorize the Debtor to seek expedited approval from the Bankruptcy Court of the sale of the applicable Sale Assets, including the TECFREF Backstop Transaction, in accordance with the Purchase Agreement.

Unless otherwise provided in the Purchase Agreement, the Confirmation Order, or any other applicable order authorizing the sale of the Sale Assets, on the closing of the sale of the PHN Unit or the PHS Unit, the applicable Sale Assets shall be purchased, acquired, assumed, and accepted by and vested in the Purchaser free and clear of all pledges, liens, security interests, encumbrances, Claims, charges, options, or

interests thereon, including (without limitation) any possessory rights in the Sale Assets, whether pursuant to section 365(h) of the Bankruptcy Code or otherwise. The Purchaser shall not be deemed to (i) be the successor of the Debtor by reason of any theory at law or in equity, (ii) assume, incur or be responsible for any Claims or other liabilities of the Debtor or any of its Affiliates, (iii) have, de facto or otherwise, merged with or into the Debtor, or (iv) be a mere or substantial continuation of the Debtor or the enterprise of the Debtor. The Purchaser shall not assume or have any liability or obligation for any Claim against the Debtor except for those liabilities specifically assumed by the Purchaser pursuant to the terms of its applicable Purchase Agreement.

Furthermore, in order to better facilitate a sale of the Sale Assets, Article 8.2 of the Plan also provides that, unless, prior to the Confirmation Date, Withanage and all other occupants have vacated, quit, and otherwise surrendered any portion of the Sale Assets that they are occupying, concurrently with entry of the Confirmation Order, the Court will enter an eviction order substantially in the form attached as an exhibit to the Confirmation Order (the "***Turnover Order***"). The Confirmation Order will authorize the Debtor to take all necessary steps to effectuate such turnover and direct and authorize compliance with and enforcement of the Turnover Order by the U.S. Marshal and/or local authorities.

### C. Exemption from Transfer Taxes

Pursuant to Article 8.10 of the Plan, the sale of the Sale Assets shall not be subject to any sales and use, stamp, real estate transfer, documentary stamp, mortgage recording, or other similar tax. Furthermore, in the event that TECREF or its nominee is the Purchaser of all or a portion of the Sale Assets, including in connection with the TECREF Backstop Transaction, any subsequent conveyance by TECREF or its nominee of such purchased Sale Assets, within three (3) years after the Effective Date, shall be deemed to have occurred under the Plan and also shall be free of sale and use, stamp, real estate transfer, documentary stamp, mortgage recording, or other similar tax.

### D. Release of Causes of Action by the Debtor

**Separately, Article 8.11 of the Plan provides a release from the Debtor stating that, except as otherwise provided for in the Plan or the Confirmation Order or with respect to any right or obligation arising under the Plan (including, but not limited to, the right of the Debtor, the Disbursing Agent, or any party in interest, as applicable, to object to Claims or Equity Interests or exercise any setoff rights or similar rights of the Debtor), or an agreement entered into pursuant to, in connection with or contemplated by, the Plan, including any Purchase Agreement, on the Effective Date, the Debtor and its estate shall be deemed to have unconditionally and irrevocably released all Creditors or holders of Equity Interests from any and all Causes of Action that the Debtor, its estate, or any other any Entity would have been legally entitled to assert (whether individually or collectively) or that any holder of a Claim or Equity Interest would have been able to assert on behalf of the Debtor or its estate, based in whole or in part upon any act or omission, transaction, agreement, event or other occurrence or circumstances existing or taking place on or before the Effective Date; *provided, however*, that nothing in Article 8.11 of the Plan shall release any Retained Causes of Action; *provided, further*, that, for the avoidance of**

doubt, any claims or Causes of Action not released in Article 8.11 of the Plan, including the Retained Causes of Action, are expressly retained by and will vest in the Debtor as of the Effective Date, and that the provisions of this Article 8.11 shall have no effect on: (i) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability under this Plan or any contract, instrument, release, or other agreement or document (A) previously assumed, (B) entered into during this Chapter 11 Case, or (C) to be entered into, assumed, or delivered in connection with this Plan; or (ii) the liability of any released party that would otherwise result from any act or omission of such released party to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud).

Moreover, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor's release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the release is: (1) essential to the Confirmation of this Plan; (2) an exercise of the Debtors' business judgment; (3) in exchange for the good and valuable consideration and substantial contributions provided by the Releasing Parties; (4) a good-faith settlement and compromise of the Claims released by the release; (5) in the best interests of the Debtor and all holders of Claims and Equity Interests; (6) fair, equitable, and reasonable; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the releases by the Debtor.

E.      Releases by the Releasing Parties

Article 8.12 of the Plan provides that except as otherwise provided for in the Plan or the Confirmation Order (including, without limitation, with respect to any Retained Causes of Action) or with respect to any right or obligation arising under the Plan or an agreement entered into pursuant to, in connection with or contemplated by, the Plan, including any Purchase Agreement, on the Effective Date, the Releasing Parties shall be deemed to have unconditionally and irrevocably released the Debtor and its estate, and holders of its Equity Interest from any and all Causes of Action that the Releasing Party or any other any entity would have been legally entitled to assert (whether individually or collectively) or that any holder of a claim or equity interest would have been able to assert on behalf of the Releasing Party based in whole or in part, upon the Debtor and its estate's act or omission, transaction, agreement, event or other occurrence or circumstances existing or taking place on or before the Effective Date; *provided, however*, that, for the avoidance of doubt, the provisions of Article 8.12 shall have no effect on: (i) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability under this Plan or any contract, instrument, release, or other agreement or document (A) previously assumed, (B) entered into during this Chapter 11 Case, or (C) to be entered into, assumed, or delivered in connection with this Plan; or (ii) the liability of the Debtor and its estate that would otherwise result from any act or omission of the Debtor and its estate to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud).

**Moreover, entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Releasing Parties' release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the release is: (1) essential to the Confirmation of this Plan; (2) given in exchange for the good and valuable consideration and substantial contributions provided by the Releasing Party; (3) a good-faith settlement and compromise of the Claims released by the Releasing Party; (4) in the best interests of the Debtor and its estate; (5) fair, equitable, and reasonable; (6) given and made after due notice and opportunity for hearing; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to this release by the Releasing Parties.**

F.    Injunction and Exculpation Provisions

**The Plan provides for the following customary injunction and exculpation provisions.**

Article 8.14 provides that except as otherwise provided in the Plan or the Confirmation Order, from and after the Effective Date, to the extent a party's Claim has been released pursuant to this Plan or the Confirmation Order, such party shall be permanently enjoined from pursuing such Claim against the applicable released party for any reason at any time on or after the Effective Date, including (i) commencing or continuing in any manner any action or other proceeding of any kind, including on account of any Claims, Equity Interests, Causes of Action, or liabilities that have been released; (ii) enforcing, levying, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any Lien, Claim, or encumbrance of any kind; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor, and its estate and (v) commencing or continuing any act, in any manner, or in any place to assert any Claim, or send any notice or invoice in respect of any Claim that has been released under this Plan or that does not otherwise comply with or is inconsistent with the provisions of this Plan, or from making or threatening to make or assert any claim in any liquidation of any Debtor under any applicable law; provided, however, that nothing contained in this Plan shall (A) preclude an Entity from obtaining benefits directly and expressly provided to such Entity pursuant to the terms of this Plan or (B) be construed to prevent any Entity from defending against Claims objections or collection action, whether by asserting a right of setoff, recoupment, or otherwise, to the extent permitted by law.

Article 8.15 provides that from and after the Effective Date, the Exculpated Parties shall neither have nor incur any liability to any  Entity, and no Holder of a Claim or Interest, no other party in interest, and none of their respective current and former officers, managers, directors, equity holders (regardless of whether such interests are held directly or indirectly), principals, members, employees, agents, independent contractors, management companies, investment advisors, fund advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such, shall have any right of action against any Exculpated Party for any act taken or

omitted to be taken before the Effective Date based on the Chapter 11 Case, the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation, or consummation of this Plan, the Exhibits, the Disclosure Statement, any amendments thereof or supplements thereto, the Plan Supplement, or any other transactions in connection with the Chapter 11 Case or any contract, instrument, release, or other agreement or document created or entered into or any other act taken or omitted to be taken in connection therewith or in connection with any other obligations arising under the Plan or the obligations assumed hereunder; *provided*, *however*, that the foregoing provisions of Article 8.15 shall have no effect on: (a) the liability of any Entity that would otherwise result from the failure to perform or pay any obligation or liability under this Plan or any contract, instrument, release, or other agreement or document (i) previously assumed, (ii) entered into during the Chapter 11 Case, or (iii) to be entered into or delivered in connection with this Plan; (b) the liability of any Exculpated Party from any obligation or liability under this Plan; or (c) the liability of any Exculpated Party that would otherwise result from any act or omission of such Exculpated Party to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct (including fraud).

### G. Funding Distributions Under the Plan

Under the Plan, all Distributions to holders of Unsecured Claims in Class 7, and holders of Equity Interests will be funded entirely from Available Cash. "Available Cash" is all Cash of the Debtor as of the last day of the month immediately preceding a Distribution Date, less the amount of Cash (i) necessary to pay all reasonable fees and actual expenses of the Disbursing Agent and a reserve for future estimated fees and expenses likely to be incurred by the Disbursing Agent, including any expenses associated with the procurement of a surety bond or insurance by the Disbursing Agent in accordance with Article 7.1 of the Plan, if any; (ii) necessary to pay all fees required to be paid pursuant to section 1930 of title 28 of the United States Code and a reserve for future estimated fees required to be paid pursuant to section 1930 of title 28 of the United States Code; (iii) required to pay any unpaid Allowed Administrative Expenses, Allowed Secured Claims, Allowed Priority Tax Claims, and Allowed Priority Claims; and (iv) required to be retained by the Disbursing Agent for any Disputed Administrative Expenses, Disputed Other Secured Claims, Disputed Priority Tax Claims, and Disputed Priority Claims.

### H. Disbursing Agent

All Distributions under the Plan shall be made by the Disbursing Agent, who will be the Debtor in its capacity as a disbursing agent. The Disbursing Agent will not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court, and, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be a deduction from Available Cash.

### I. Distributions to Holders of Allowed Claims and Equity Interests

On each Distribution Date, to the extent that the Disbursing Agent has Available Cash, the Disbursing Agent will distribute such Available Cash to the holders

of Allowed Claims and holders of Equity Interests in accordance with the provisions of the Plan.

If any Distribution to be made under the Plan is due on a day other than a Business Day, such Distribution will instead be made, without interest, on the immediately succeeding Business Day, but will be deemed to have been made on the date due.

Any Distribution to be made pursuant to the Plan will be deemed to have been timely made if made within fourteen (14) days after the time therefor specified in the Plan. No interest will accrue or be paid with respect to any Distribution as a consequence of such Distribution not having been made on the time therefor specified in the Plan.

No Cash payments of fractions of cents will be paid. Fractional cents will be rounded to the nearest whole cent (with .5 cent or less to be rounded down).

Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim or Allowed Equity Interest shall be made at the last known address of such holder as set forth on the Schedules filed with the Bankruptcy Court, or on the books and records of the Debtor or its agents, unless the Disbursing Agent has been notified in writing by the holder of such Claim or Equity Interest of a change of address, including, without limitation, by the filing of a proof of claim by such holder that contains an address for such holder different from the address for such holder listed on the Schedules or the Debtor's books and records; *provided, however*, that the Disbursing Agent shall not be obligated to make any further Distributions to any holder of Allowed Claim or Allowed Equity Interest where a prior Distribution to any such holder was either returned to the Disbursing Agent as undeliverable or unclaimed as set forth in Article 7.9 of the Plan.

## J.    Treatment of Disputed Claims

Any party in interest may object to the allowance or seek subordination of Claims filed with the Bankruptcy Court, except for the Claims of JPMorgan, TECREF, and Tyrus Capital which are deemed Allowed under the Plan.  Unless otherwise provided herein or ordered by the Bankruptcy Court, all objections to Claims shall be served and filed no later than the Claims Objection Deadline.

## K.    Occurrence of the Effective Date

Other than the satisfaction of all conditions to the occurrence of the sale of the Sale Assets, which condition may be waived as outlined above and set forth in Article 8.6(c) of the Plan, the other conditions to effectiveness of the Plan include that the Confirmation Order has been entered, is in full force and effect, and otherwise is not subject to any stay, that the Bar Date has occurred for all holders of Claims other than governmental units and that, unless waived by the Debtor (which can only be waived with the consent of TECREF), the total Allowed Amount of Allowed Claims plus the Disputed Claim Amount of Disputed Claims in Classes 4, 5, and 6 do not exceed $50,000.

# V.    CONFIRMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan.

## A.    Solicitation of Votes

In accordance with sections 1126 and 1129 of the Bankruptcy Code, each known holder of a Claim in Class 7 is impaired under the Plan and receiving a Ballot to vote to accept or reject the Plan.  Notwithstanding the Debtor's designation of the Rahula Withanage Unsecured Claim (which is a Claim in Class 7) as a Disputed Claim, the Debtor is soliciting the vote of the holder of the Rahula Unsecured Claim on this Plan.  If the Debtor or another party in interest objects to a Disputed Claim, including the Disputed Rahula Withanage Unsecured Claim, and the Bankruptcy Court enters an order disallowing such Disputed Claim in full on or before the Confirmation Date, then any Ballot cast by the holder of the Disputed Claim will not be counted in determining whether Class 7 voted to accept or reject the Plan.  Holders of Claims in Classes 1, 2, 3, 4, 5, 6, and 8 are conclusively presumed to accept the Plan because they are Unimpaired by the Plan.

## B.    The Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing to consider confirmation of the Plan (the "***Confirmation Hearing***").  On or around the Petition Date, the Debtor will file a motion requesting that the Bankruptcy Court schedule the Confirmation Hearing in respect of the Plan on July 22,2021 (the "***Scheduling Motion***").  The Scheduling Motion will also request that the Bankruptcy Court determine at the Confirmation Hearing whether this Disclosure Statement contains adequate information under section 1125(a) of the Bankruptcy Code and whether the Debtor's prepetition solicitation of acceptances in support of the Plan complied with section 1126(b) of the Bankruptcy Code.  There is no guaranty that the Bankruptcy Court will schedule the Confirmation Hearing for such time and place but the Debtor will notify all holders of Claims and Interests when the date, time and place of the Confirmation Hearing has been scheduled by the Bankruptcy Court.  Once scheduled, the Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

The Debtor, in the Scheduling Motion, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to the adequacy of the Disclosure Statement, the Debtor's prepetition solicitation of acceptances in support of the Plan, and confirmation of the Plan.  At such time, any such objection must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection, and the amount and Class of the Claim.  Any such objection must be filed with the Bankruptcy Court and served so that it is actually received by the Bankruptcy Court, the following persons, and any other persons required to be served under the Bankruptcy Rules, on or before such time as the Bankruptcy Court may decide:

**_If to the Debtor_:**

> Zuca Properties LLC
> c/o JTC (Suisse) SA
> 80-84 Rue du Rhone
> 1204 Geneva, Switzerland
> Attention:  Julie Zingiloglu
> By Phone: +44 22 596 3322
> By Email: Julie.zingiloglu@jtcgroup.com
>
> With a copy to:
>
> Togut, Segal & Segal LLP
> One Penn Plaza, Suite 3335
> New York, New York 10119
> Attention: Kyle J. Ortiz
> By Phone:  +1 212 594 5000
> By Email: kortiz@teamtogut.com

**_If to the U.S. Trustee_:**

> Greg M. Zipes
> Trial Attorney
> Office of the United States Trustee
> 201 Varick Street, Suite 1006
> New York, NY   10014
> Telephone: (212) 510-0500
> Facsimile:  (212) 668-2255

**_If to TECREF_:**

> TECREF S.à r.l
> 1, Boulevard de la Foire, L-
> 1528 Luxembourg,
> Grand Duchy of Luxembourg
> Attention: Daniela Klasén-Martin and Andrzej Olow
> By Phone: +352 26 215 400
> By Facsimile: +352 25 215 450
> By Email: tecref.lux@crestbridge.com
>
> With a copy to:
>
> Baker & McKenzie LLP
> 452 Fifth Avenue
> New York, New York 10018
> Attn: Debra Dandeneau, Frank Grese
> debra.dandeneau@bakermckenzie.com
> frank.grese@bakermckenzie.com

***If to The Woofy Trust:***

> The Woofy Trust
> Attention:  JTC (Suisse) SA
> 80-84 Rue du Rhone
> 1204 Geneva, Switzerland
> By Phone: +41 22 596 3322
> By Email: Julie.zingiloglu@jtcgroup.com
>
> With a copy to:
>
> Mayer Brown LLP
> 1221 Avenue of the Americas
> New York, New York 10020
> Attention:  Joaquin M. C de Baca
> By Phone: +1 212-506-2158
> By Facsimile: +1 212-262-1910
> By Email: JCDeBaca@mayerbrown.com

Objections to confirmation of the Plan or any other relief sought in the Scheduling Motion are governed by Bankruptcy Rule 9014.

### C.      Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of the Plan are that the Plan is (i) accepted by all impaired classes of Claims and Equity Interests or, if rejected by an impaired class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class and (ii) in the "best interests" of creditors and stockholders that are impaired under the Plan.  Because the Plan contemplates a sale of all the Debtor's assets, the Plan does not need to be "feasible."

The Debtor believes the Plan satisfies all the requirements of the Bankruptcy Code.

*[remainder of page left blank intentionally; concludes on following page]*

## VI.    CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan will provide the greatest recoveries to holders of Allowed Claims and Allowed Equity Interests.

Dated:  New York, New York
          June 7, 2021

Respectfully submitted,

ZUCA PROPERTIES LLC
By:

*/s/ Julie Zingiloglu*
Julie Zingiloglu
Title:  Managing Director of JTC (Suisse) S.A.
as Trustee of The Woofy Trust and Sole
Managing Member of Zuca Properties LLC

By its Attorneys
TOGUT, SEGAL & SEGAL LLP
By:

*/s/ Kyle J. Ortiz*
Kyle J. Ortiz
Brian F. Moore
Katharine E. Scott
One Penn Plaza, Suite 3335
New York, New York 10119
Telephone: (212) 594-5000